

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Santiago Rivera Figueroa,<br>Olga María Carrasquillo Rodríguez<br>Y la Sociedad Legal de Gananciales<br>Compuesta por ambos<br><br>      Peticionarios<br><br>          v.<br><br>Autoridad de Acueductos y Alcantarillados<br>de Puerto Rico y Aseguradora Equis<br><br>      Recurridos | Certiorari<br><br>2009 TSPR 162<br><br>177 DPR \_\_\_\_ |

Número del Caso: CC-2007-285


Fecha: 23 de octubre de 2009


Tribunal de Apelaciones:

      Región Judicial de San Juan, Panel VI


Juez Ponente:

         Hon. Carlos M. Rodríguez Muñiz


Abogada de la Parte Peticionaria:

         Lcda. Rita M. Vélez González

Abogada de la Parte Recurrida:

         Lcda. Maite M. Medero Benítez

Materia: Daños y perjuicios por represalias al amparo de la ley #115 del 20 de diciembre de 1991 y el artículo 1802 del código civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Santiago Rivera Figueroa, Olga María Carrasquillo Rodríguez y la Sociedad Legal de Gananciales compuesta por ambos
   Peticionarios

     v.

Autoridad de Acueductos y Alcantarillados de Puerto Rico y Aseguradora Equis
    Recurridos

CC-2007-285

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 23 de octubre de 2009.

En este recurso debemos resolver si la reclamación del peticionario Santiago Rivera Figueroa cumplió con los requisitos esenciales de una causa de acción al amparo de la Ley Núm. 115 de 20 de diciembre de 1991, mejor conocida como Ley de Represalias, 29 L.P.R.A. sec. 194 y ss. La controversia principal gira en torno a si los hechos probados ante el Tribunal de Primera Instancia constituyen o no una actividad protegida bajo dicha disposición laboral, aunque la actividad fuera parte de las funciones del empleo del peticionario. Concluimos que se estableció una reclamación cobijada por la Ley de Represalias y por eso revocamos la sentencia recurrida.

I

El señor Rivera Figueroa, junto a su esposa y en representación de la sociedad de bienes gananciales compuestas por ambos, presentó una demanda ante el Tribunal de Primera Instancia contra la Autoridad de Acueductos y Alcantarillados (AAA). En la querella, los peticionarios solicitaron indemnización por los daños causados por un patrón de actos discriminatorios y en represalias contra el señor Rivera Figueroa en violación a la Ley Núm. 115, supra. La esposa del querellante solicitó indemnización al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141.

El Tribunal de Primera Instancia consignó en su sentencia los hechos probados ante sí en quince (15) sesiones públicas durante el período del 29 de octubre al 29 de noviembre de 2005. Los hechos pertinentes a este recurso de certiorari, que fueron determinados por el juzgador de hechos, son los siguientes:

La agencia federal Enviromental Protection Agency (EPA), como parte de su rol fiscalizador y de investigación comenzó a multar a la AAA por el incumplimiento de ésta con la Ley Federal de Aguas Limpias (Federal Water Pollution Control Act), 33 U.S.C. 1251 et seq. Como secuela de esta investigación administrativa conducida por la EPA contra la AAA, la agencia federal acudió al Tribunal Federal para el Distrito de Puerto Rico. La EPA alegó que la AAA operó inefectivamente por años las plantas de tratamiento, lo

que provocó la contaminación de las aguas navegables de Puerto Rico. La AAA aceptó las alegaciones de la EPA y el Tribunal Federal para el Distrito de Puerto Rico determinó que la AAA violó la referida ley ambiental federal. Como parte del proceso para corregir las violaciones, el Tribunal Federal para el Distrito de Puerto Rico nombró un monitor. Este monitor tenía el deber de visitar las facilidades bajo observación de la AAA e inspeccionarlas para asegurar el cumplimiento con la orden judicial. El deber de evaluación del monitor era sobre las plantas de la AAA "arrestadas" por la orden judicial debido a su operación ineficiente. El monitor quedó facultado para someter reportes y recomendaciones al Tribunal Federal con el propósito de imponer penalidades.

Posteriormente, la EPA acudió nuevamente al Tribunal Federal para el Distrito de Puerto Rico, al alegar que la AAA continuaba en violación de la orden de 28 de febrero de 1985. El Tribunal Federal encontró que las violaciones imputadas y la falta de esfuerzos por parte de la AAA para corregir la situación se encontraban sostenidas por la prueba y por las determinaciones hechas por el monitor. El dictamen judicial sostuvo la imposición de $32,032,600.00 como multa a la AAA, sujeta a ser modificada. La omisión por parte de la AAA de notificar y corregir las ocurrencias de desvíos y desbordes en sus estaciones la exponía al pago de cuantiosas sanciones económicas. Véase: United

States v. Puerto Rico Aqueduct and Sewer Authority, 1987 U.S. Dist. LEXIS 8339.

Para facilitar el cumplimiento con la orden del Tribunal Federal, la AAA creó el puesto de Cotejador de Sistemas de Bombeo de Alcantarillados. El puesto tenía la responsabilidad de visitar cada una de las plantas de bombeo de alcantarillados, cumplimentar las bitácoras sitas en cada estación y rendir unos informes en los que se hacía constar el estado y funcionamiento de las plantas de bombeo, incluyendo averías en el sistema que causaran desvíos o desbordes de aguas usadas. Estos informes se utilizaban para cumplir con las órdenes del Tribunal Federal. De esta forma, se tenía que notificar al Tribunal Federal y a la EPA cualquier avería en las instalaciones de la AAA, los motivos para la avería y el plan de corrección. Por otra parte, el monitor facilitaba la revisión sobre el cumplimiento de la AAA con las órdenes del Tribunal Federal.

El peticionario Rivera Figueroa, quien laboraba desde el 1978 para la AAA, ocupó el puesto de Cotejador de Sistemas de Bombeo de Alcantarillados desde el 1988 para el área de Caguas y Gurabo. Le fue añadida el área de Juncos en 1996. El señor Rivera Figueroa ejerció dichas funciones hasta el 7 de febrero de 2001, fecha en que la Administración del Seguro Social lo declaró incapacitado. El peticionario tenía entre sus obligaciones: visitar las estaciones de bombeos a su cargo, notificar inmediatamente los desvíos ocurridos y

examinar el estado de los paneles eléctricos y de las bombas. Además, el señor Rivera Figueroa tenía que anotar las condiciones de cada estación visitada, en una bitácora que permanecía en la estación. Para cumplir con la orden del Tribunal Federal, la AAA diseñó un formulario titulado "Informe de Inspección de Estación de Bombeo Sanitario". En éste, el peticionario debía incluir la información producto de su visita. La información a incluirse en este reporte era similar a la contenida en la bitácora de la estación. Una vez el señor Rivera Figueroa terminaba este informe debía procurar la firma de un supervisor para dotarlo de credibilidad ante la EPA y el monitor.

Estos informes que cumplimentaba el peticionario llegaban a los inspectores de la EPA y al monitor. Esto es, los reportes y la información que declaraba el señor Rivera Figueroa en los informes pasaban a ser parte de los procesos ante la EPA y ante el Tribunal Federal. Por lo tanto, las declaraciones que el peticionario hacía para cumplir con las obligaciones de su puesto son la base de este caso.

El 21 de enero de 1999, el peticionario presentó una reclamación al amparo de la Ley Núm. 115, supra, al Comité de Querellas de la AAA.[1] El 21 de agosto de 2000,

---

[1] Hizo esto después que presentó su reclamo al Tribunal de Primera Instancia el 13 de agosto de 1997. En esa ocasión, ese foro desestimó la querella porque no se agotó el procedimiento provisto en el Convenio Colectivo.

el Comité de Querellas se declaró sin jurisdicción para conceder el remedio solicitado. Entonces, el 22 de noviembre de 2000, el peticionario presentó ante el Tribunal de Primera Instancia el recurso que nos ocupa.

El 15 de diciembre de 2005, el foro primario emitió sentencia en la que declaró con lugar la querella presentada. En la misma, el tribunal determinó que: (1) el señor Rivera Figueroa fue objeto de una serie de actos discriminatorios sin justificación válida; (2) estos actos discriminatorios en su perjuicio se debieron a las declaraciones que el peticionario hizo en cumplimiento de las funciones de su puesto (desde 1988 hasta su retiro por incapacidad en el 2001); (3) el peticionario acompañaba al personal de la EPA y al monitor en sus visitas a las facilidades de la AAA a su cargo y en dichas visitas informaba verbalmente sobre el mal estado de las instalaciones; (4) el peticionario preparaba informes que eran revisados por funcionarios de la EPA y por el monitor; (5) las anotaciones del peticionario en las bitácoras también eran examinadas por los funcionarios de la EPA y por el monitor; (6) estas declaraciones del peticionario provocaban la ira de sus supervisores, quienes pretendían que el peticionario hiciera declaraciones falsas para evitarle responsabilidades monetarias a la AAA; (7) no había otra razón justificada para el trato discriminatorio que recibió el peticionario; (8) en ocasiones los supervisores de la AAA arrancaban páginas de las

bitácoras que el peticionario había llenado, para evitar la revisión de estos documentos por parte del personal de la EPA; (9) el peticionario recibió atención médica y medicamentos anti depresivos por años para tratar los daños que esta situación causó; y (10) esto provocó el deterioro de la salud del peticionario, quien se incapacitó en el 2001, fecha desde la cual no trabaja.

Según las determinaciones del Tribunal de Primera Instancia, el trato discriminatorio contra el señor Rivera Figueroa consistió en: (1) la privación de equipo esencial para su puesto, a saber, vehículo y radio teléfono; (2) la negativa por parte de los supervisores a considerar y firmar sus informes, al extremo que en ocasiones hasta los echaban al zafacón; (3) la remoción de las bitácoras en sus estaciones y el cambio de los candados que limitaban el acceso del señor Rivera Figueroa al lugar de las mismas; (4) el uso de palabras soeces y agresiones verbales en su contra; (5) el traslado involuntario e injustificado a otra plaza; (6) la negativa injustificada a autorizar el pago de las horas extras a las que tenía derecho el señor Rivera Figueroa, lo cual lo obligaba a acudir continuamente al proceso de arbitraje; y (7) la persecución contra el señor Rivera Figueroa para disciplinarlo injustificadamente.

Además, el foro primario determinó que las acciones de los superiores del peticionario Rivera Figueroa le ocasionaron a su esposa graves sufrimientos y profundas

angustias mentales. Para esto, el foro primario concluyó que la condición que sufre el señor Rivera Figueroa (depresión mayor severa recurrente con rasgos sicóticos) agravó la condición nerviosa de su esposa.

Ante estos hechos, el Tribunal de Primera Instancia razonó que el peticionario Rivera Figueroa realizó una actividad protegida por la Ley Núm. 115, supra, al hacer declaraciones que pasaban a ser parte de un proceso administrativo y judicial (información dada a inspectores de la EPA y al monitor). Que por estas declaraciones fue objeto de amenazas, persecución y discrimen en su empleo. Esta evidencia fue suficiente para que el foro primario determinara que el señor Rivera Figueroa presentó un caso prima facie al amparo de la Ley Núm. 115, supra. Debido a la ausencia de razón legítima y no discriminatoria, el Tribunal de Primera Instancia declaró con lugar la querella contra la AAA.

Conforme a la Ley Núm. 115, supra, el Tribunal de Primera Instancia le impuso a la AAA la responsabilidad de compensar al señor Rivera Figueroa por el doble de sus daños reales, angustias mentales y salarios dejados de percibir, más los honorarios de abogado. Art. 2 de la Ley Núm. 115, supra, sec. 194a(b). Además, la sentencia impuso responsabilidad a la AAA frente a la esposa del querellante bajo el Art. 1802, supra.

El foro primario concedió al querellante un total de $262,389.56 como indemnización, lo que con la penalidad provista en la Ley Núm. 115, supra, ascendió a

$524,779.12. Las partidas concedidas se distribuyeron de la siguiente manera: (a) $102,400.65 por salarios dejados de percibir desde la fecha de su incapacidad hasta la sentencia (4 años y 11 meses), después del descuento de las sumas recibidas como pensión del seguro social; (b) $109,988.91 por concepto de pago futuro de salarios; y (c) $50,000.00 por angustias mentales. Además, se le impuso a la AAA el pago del 25% de la cantidad concedida por concepto de honorarios de abogados.

En relación con la causa de acción de la esposa del querellante, el Tribunal de Primera Instancia ordenó el pago de $25,000.00 por concepto de sufrimientos y angustias mentales.

Inconforme con esta determinación, la AAA acudió al Tribunal de Apelaciones, el cual revocó la sentencia recurrida. Ese foro, con la prueba que constaba en el expediente, determinó que el señor Rivera Figueroa no presentó prueba suficiente para justificar una acción al amparo de la Ley Núm. 115, supra. El tribunal intermedio cuestionó las determinaciones de hechos que efectuó el foro primario sobre las conversaciones del señor Rivera Figueroa con funcionarios de la EPA y el monitor. Además, contrario al dictamen del Tribunal de Primera Instancia, el Tribunal de Apelaciones concluyó que los informes preparados por el señor Rivera Figueroa no eran parte directa del proceso de cumplimiento con la orden judicial sino que servían de data para otros que sí eran

parte. Ante esto, el Tribunal de Apelaciones concluyó que las funciones particulares del señor Rivera Figueroa como Cotejador de Sistemas de Bombeo de los Alcantarillados y probadas en juicio (a saber, presentar informes) eran parte de las obligaciones de su puesto, por lo que no se estableció que Rivera Figueroa participó en una actividad protegida por la Ley Núm. 115, supra.

El señor Rivera Figueroa y su esposa acuden ante nos y señalan que el Tribunal de Apelaciones incidió en su proceder. En síntesis, los peticionarios arguyen que ese tribunal erró al determinar que el señor Rivera Figueroa no participó en una actividad protegida al amparo de la Ley Núm. 115, supra. Plantean los peticionarios que la referida legislación laboral protege al señor Rivera Figueroa, pues a su juicio, los hechos de este caso configuran una actividad protegida por dicha ley. Además, arguyen los peticionarios que el Tribunal de Apelaciones se equivocó al alegadamente intervenir con la apreciación de la prueba que realizó el foro primario.

El 11 de mayo de 2007 expedimos el auto de *certiorari* y el recurso quedo sometido en sus méritos con las comparecencias de las partes. Con el beneficio de éstas, procedemos a resolver la controversia planteada.

II

Para disponer de este recurso es preciso: (1) revisar la corrección de las determinaciones de hechos efectuadas por los foros de inferior jerarquía; y (2) delimitar el ámbito de aplicación de la Ley de Represalias. Esto es necesario para dilucidar si el querellante demostró que realizó una actividad protegida bajo dicho estatuto.

A

La Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2, expresa que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". Por eso, los tribunales apelativos deben brindarle gran deferencia al juzgador de los hechos, pues éste se encuentra en mejor posición para evaluar la credibilidad de un testigo. Ramírez Ferrer v. Conagra Foods PR, Opinión de 14 de abril de 2009, 2009 T.S.P.R. 55, 2009 J.T.S. 58, 175 D.P.R. ___ (2009); Trinidad v. Chade, 153 D.P.R. 280, 291 (2001); Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. 721, 728 (1984). Ya que un foro apelativo cuenta solamente con "récords mudos e inexpresivos" se le debe respeto a la adjudicación de credibilidad realizada por el juzgador primario de los hechos. Trinidad v. Chade, supra, pág. 291; Pérez Cruz v. Hosp. La Concepción, supra, pág. 728. Los conflictos

de prueba deben ser resueltos por el foro primario. Ibíd.

Es norma fundamental que un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad del foro primario a menos que este último haya incurrido en error manifiesto, pasión, prejuicio o parcialidad. Flores v. Soc. de Gananciales, 146 D.P.R. 45, 49 (1998); Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49 (1991); Ortiz v. Cruz Pabón, 103 D.P.R. 939 (1975). La intervención de un foro apelativo con la evaluación de la prueba testifical procede "en casos en que un análisis integral de dicha prueba cause en nuestro ánimo una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia". Pueblo v. Cabán Torres, 117 D.P.R. 645, 648 (1986). Para su revocación, el apelante tiene que señalar y demostrar la base para ello. Ibíd. La parte que cuestione una determinación de hechos realizada por el foro primario debe señalar el error manifiesto o fundamentar la existencia de pasión, prejuicio o parcialidad. Flores v. Soc. de Gananciales, supra.

La evidencia directa de un testigo que le merezca entero crédito al juzgador de hechos es prueba suficiente de cualquier hecho. Regla 10(D) de Evidencia de 1979, 32 L.P.R.A. Ap. IV, R 10(D); Trinidad v. Chade, supra. En casos en que se alega discrimen y existe controversia sobre el particular, la evaluación de los

testimonios por el juzgador de hechos se vuelve esencial para la adjudicación de credibilidad ya que se determinan elementos subjetivos y de intención. Ramírez Ferrer v. Conagra Foods PR, supra; López v. Miranda, 166 D.P.R. 546 (2005); Soto v. Hotel Caribe Hilton, 137 D.P.R. 294 (1994).

B

En vista de la deferencia que le debemos los tribunales apelativos a las determinaciones de hechos de los foros primarios, no podemos menospreciar la adjudicación de credibilidad que el Tribunal de Primera Instancia realizó en este caso. Después de un detenido examen del expediente, tenemos que concluir que el Tribunal de Primera Instancia no erró en su apreciación de la prueba.

Para cumplir con las exigencias de la EPA y con la orden del Tribunal Federal para el Distrito de Puerto Rico, la AAA estableció unos procedimientos administrativos para notificar y corregir las fallas en sus instalaciones. Este proceso era de vital importancia para la AAA, pues no notificar o corregir las fallas provocaba la imposición de cuantiosas multas contra la agencia.

Para estos fines se creó el puesto de Cotejador de Sistemas de Bombeo de Alcantarillados (cotejador). Además, se creó un formulario que debía ser llenado por el cotejador. Dicha plaza tenía las siguientes funciones: (1) acudir a las estaciones asignadas para

verificar el estado y funcionamiento del equipo de bombeo; (2) notificar inmediatamente los desvíos ocurridos en las facilidades de la AAA; (3) anotar las condiciones observadas en las bitácoras que se mantenían en las estaciones (sobre funcionamiento de las bombas); y (4) llenar un formulario con información similar a la requerida para la bitácora (Informe de Inspección de Estación de Bombeo Sanitario). En 1988 se seleccionó para este puesto al peticionario, quien ya laboraba para la AAA desde el 1978. Éste ocupó el puesto hasta el 7 de febrero de 2001, cuando se incapacitó.

El peticionario Rivera Figueroa hacía anotaciones en las bitácoras y en sus informes. Estas anotaciones reflejaban deficiencias en las operaciones de la AAA. Las bitácoras en las estaciones eran examinadas por funcionarios de la EPA y por el monitor en sus visitas a las facilidades. Los informes preparados por el señor Rivera Figueroa llegaban a manos del personal de la EPA y al monitor. El peticionario informaba verbalmente al personal de la EPA y al monitor el estado del equipo de bombeo y de los desvíos ocurridos. Esta información era provista por el señor Rivera Figueroa cuando el personal de la EPA y el monitor visitaban las facilidades. Estas situaciones provocaron que sus supervisores tomaran represalias contra el señor Rivera Figueroa, lo que condujo a su posterior incapacidad. Estas conclusiones a las que llegó el foro primario se encuentran respaldadas por la prueba.

En el juicio, el Ing. Luis Camacho Rivera, testigo de la AAA, expresó que ante la ocurrencia de un desvío había que hacer un plan de corrección para la falla que indicara el tiempo estimado de reparación. Esto era necesario para el cumplimiento de la orden judicial. De no cumplir con el plan suministrado, la AAA se exponía a la imposición de multas. Trascripción de la vista, Apéndice Sol. *Cert.*, págs. 1859-1868. Además, el ingeniero Camacho Rivera testificó que el monitor examinaba las bitácoras y que algunas de las anotaciones del peticionario le creaban a la AAA problemas con la EPA, pues reflejaban violaciones a la orden judicial. Ejemplo de esto fueron las anotaciones que exponían que las instalaciones no habían sido cotejadas en más de cinco días. Id., págs. 1940-1943. En síntesis, este testigo expresó que (1) los informes preparados por el querellante eran parte del proceso para cumplir con la orden judicial; (2) las bitácoras eran documentos que el tribunal aceptaba; y (3) las anotaciones del querellante le causaban problemas a la AAA. Id., págs. 1811-1812 y 1924-1927.

En su testimonio, el señor Rivera Figueroa estableció que mantenía comunicación mensual con funcionarios de la EPA y con el monitor. En estas comunicaciones, el peticionario les indicaba verbalmente, entre otras cosas, las deficiencias operacionales de las facilidades de la AAA. Además, el peticionario presentó evidencia oral sobre las multas

que se le imponían a la AAA por no corregir las fallas que éste señalaba en sus informes; que el monitor examinaba las bitácoras que el peticionario cumplimentaba; que los informes que éste preparaba llegaban a la EPA; y que la AAA actuó en su contra por proveer información que afectaba a la corporación pública. Id., págs. 576-577, 580-589 y 857-861. El peticionario indicó que fue objeto de represalias por negarse a alterar las bitácoras e informes. Estas exigencias buscaban eliminar la constancia de fallas en las estaciones para evitar la imposición de multas. Id., págs. 1213-1221.

Además, el Ing. Juan Calderón García, testigo de la AAA, declaró que los informes realizados por el señor Rivera Figueroa debían ser firmados para que tuvieran mayor credibilidad ante la EPA y el monitor. Específicamente, este testigo manifestó que los informes preparados por el peticionario llegaban a la EPA y al monitor. Id., págs. 2119 y 2183-2184.

De la declaración jurada del difunto Julio Flores González (quien en vida fue empleado de la AAA), la cual fue admitida en evidencia, surge: (1) que las bitácoras eran examinadas periódicamente por funcionarios de la EPA; (2) que se le imponían multas a la AAA por no corregir las fallas; (3) que algunos supervisores de la AAA arrancaban páginas de las bitácoras para evitar multas; y (4) que el peticionario fue hostigado por la información que brindó en las bitácoras e informes. Id.,

págs. 71-72. Además, los testigos y ex compañeros de trabajo del peticionario, Carlos Figueroa Agosto y Gerardo González Rosario, prestaron testimonios similares. Véase, Id., págs. 409-412, 1574-1583, 1644-1648 y 1658-1673.

En su testimonio, el señor González Rosario testificó sobre los pedidos hechos al peticionario por parte de sus supervisores para que omitiera incidentes y alterara sus informes. Este testigo relató el patrón de persecución contra el peticionario. En una ocasión, el testigo escuchó cuando el ingeniero Calderón García manifestó en una conversación que le avisaran de cualquier incidente con el peticionario Rivera Figueroa, para disciplinarlo. No obstante, al confrontar al Ing. Calderón García con estas imputaciones, éste indicó no recordar "haber dicho una cosa como esa…". Id., pág. 2120.

Surge de los testimonios de los peritos que las causas que incapacitaron al peticionario tienen relación directa con el patrón de represalias que éste sufrió en su trabajo. El Tribunal de Primera Instancia, después de considerar los testimonios periciales y de escuchar al señor Rivera Figueroa, encontró que la situación a la que se expuso al peticionario le creó gran decepción, ansiedad y una marcada alteración nerviosa. Esto provocó que tuviera que ser atendido por el Dr. Nicolás Besares Torres y por el siquiatra, Dr. José Alonso. El Dr. Alonso testificó que el peticionario Rivera Figueroa

sufría de depresión mayor severa recurrente con rasgos sicóticos. El señor Rivera Figueroa se sometió a tratamiento médico, lo que incluyó la administración de una serie de medicamentos para mejorar su estado anímico, los que hasta la fecha de la vista aún consumía. Esta situación provocó la incapacidad del peticionario en el año 2001 debido a problemas emocionales.

El foro primario se encuentra en mejor posición para resolver los conflictos de la prueba y para adjudicar credibilidad. Así lo hizo. La AAA no ha demostrado error manifiesto, pasión, prejuicio o parcialidad. Ante tal panorama, debemos colegir que no incidió el foro primario en sus determinaciones de hechos.

### III

Ahora bien, para atender este recurso es necesario determinar si a la luz de los hechos esbozados, el querellante tiene una causa de acción al amparo de la Ley Núm. 115, supra.

### A

El Art. 2(a) de la Ley Núm. 115, id., sec. 194a(a), dispone:

> 194a. Represalias contra empleado por ofrecer testimonio; causa de acción-Prohibición; violación; responsabilidad civil
>
> (a) Ningún patrono podrá despedir, amenazar, o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque **el empleado**

> **ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial** en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

Esta ley provee protección a empleados frente a represalias que puede tomar un patrono contra éstos por proveer testimonio, expresión o información a un foro judicial, legislativo o administrativo. Ocasio v. Kelly Servs., 163 D.P.R. 653 (2005). Se otorga una causa de acción al empleado que por realizar la actividad protegida es despedido, amenazado o discriminado en el empleo. Rivera Prudencio v. Mun. de San Juan, Opinión de 2 de febrero de 2007, 2007 T.S.P.R. 19, 2007 J.T.S. 24, 170 D.P.R. ___ (2007).

Al hacer un balance de intereses, el legislador facilitó el *onus probandi* de esta causa de acción y creó una presunción una vez el obrero presenta su caso *prima facie*. Marín v. Fastening System, Inc., 142 D.P.R. 499 (1997). El esquema utilizado por el legislador es similar al establecido por el Tribunal Supremo de los Estados Unidos en McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), para los casos al amparo del Título VII de la Ley de Derechos Civiles de 1964, 42 U.S.C.A. sec. 2000e *et seq*. Véase, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).

Bajo este esquema, el empleado tiene dos vías para establecer su caso: (a) probar la violación mediante

evidencia directa o circunstancial o (b) establecer la presunción *juris tantum* de la ley. Art. 2(c), <u>supra</u>, sec. 194a(c).

Un empleado establece un caso *prima facie* o una presunción a su favor cuando prueba que: (1) participó en una actividad protegida por la ley y (2) subsiguientemente fue despedido, amenazado o discriminado en su empleo. <u>Marín v. Fastening System Inc.</u>, <u>supra</u>. Una vez el empleado prueba su caso *prima facie*, el patrono puede rebatir la presunción establecida si alega y fundamenta una razón legítima y no discriminatoria para la acción adversa. Si el patrono cumple con este segundo paso, el empleado debe demostrar que la razón alegada por el patrono es un mero pretexto para la acción adversa. Art. 2(c), <u>supra</u>. Véanse, además, <u>Ocasio v. Kelly Servs.</u>, <u>supra</u>; <u>Hernández v. Espinosa</u>, 145 D.P.R. 248 (1998).

Cuando una ley es clara y libre de toda ambigüedad, su letra no debe ser menospreciada bajo el pretexto de cumplir su espíritu. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Véase, <u>Román v. Superintendente de la Policía</u>, 93 D.P.R. 685 (1966). Cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de la intención legislativa. <u>Alejandro Rivera v. E.L.A.</u>, 140 D.P.R. 538 (1996).

Si existe alguna ambigüedad en el texto de la ley, el tribunal debe asegurar el cumplimiento de los

propósitos legislativos. En la interpretación específica de una ley es principio cardinal de hermenéutica considerar los propósitos perseguidos por la Asamblea Legislativa para asegurar el resultado originalmente querido. Vázquez v. A.R.P.E., 128 D.P.R. 513, 523 (1991); Chase Manhattan Bank v. Mun. de San Juan, 126 D.P.R. 759, 766 (1990). En la búsqueda de la intención legislativa no nos podemos limitar a la exposición de motivos de la ley sino que, además, debemos examinar su historial legislativo. Irizarry v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155 (2000).

También es principio de hermenéutica que las leyes laborales deben ser interpretadas liberalmente para conceder al trabajador la mayor protección de los derechos que el legislador estatuyó. Cintrón v. Ritz Carlton, 162 D.P.R. 32 (2004); Rosario v. Dist. Kikuet, Inc., 151 D.P.R. 634 (2000); Dorante v. Wrangler of P.R., 145 D.P.R. 408 (1998). Por eso, toda duda legítima sobre el alcance de la protección estatutaria debe ser resuelta a favor del obrero. Irizarry v. J & J Cons. Prods. Co., Inc., supra. Esta protección se debe a que los estatutos laborales tienen un fin reparador y social. Rivera Prudencio v. Mun. de San Juan, supra; C. Zeno Santiago y V.M. Bermúdez Pérez, Tratado de Derecho Del Trabajo, San Juan, Puerto Rico, Publicaciones JTS, 2003, Tomo I, Sec. 4.1[1.5], pág.94.

> *Remedial Statutes are liberally construed to suppress the evil and advance the remedy. The policy that a remedial statute should be*

*liberally construed in order to effectuate the
remedial purpose for which it was enacted is
firmly established. Expressions of a rule to
that effect appear over and over in judicial
opinions. What is called a liberal
constitution is ordinarily one which makes the
statutory rule or principle apply to more
things or in more situations that would be the
case under a strict construction.* [C. Zeno
Santiago y V.M. Bermúdez Pérez, Op. cit., pág.
94, citando a Sutherland, Statutory
Construction, 5ta Ed., 1992, Vol. 3, Sec.
60.01, págs. 147 y 866].

Una interpretación liberal no puede ser fundamento para ignorar el texto de la ley. La doctrina de interpretación liberal en las reclamaciones laborales tampoco descarta auscultar la intención legislativa cuando esto sea necesario. Ahora bien, cuando analizados el texto y la intención de la ley persiste la duda en cuanto al alcance del estatuto la interpretación debe favorecer al obrero.

La intención del legislador al aprobar la Ley Núm. 115, supra, fue ampliar la protección que hasta entonces establecía la Ley Núm. 65 de 3 de julio de 1986 y que enmendó la Ley Núm. 80 de 30 de mayo de 1976, mejor conocida como Ley de Despido Injustificado, 29 L.P.R.A. 185b. Véase, Informe de la Comisión de Trabajo y Asuntos del Veterano para el P. del S. 987 de 25 de octubre de 1991, hoy Ley Núm. 115, supra. Con esta ley se estableció en Puerto Rico una ley de represalias general que se convirtió en la piedra angular sobre este aspecto del derecho laboral. Rivera Prudencio v. Mun. de San Juan, supra; C. Zeno Santiago, Re-enfoque empresarial de

las represalias en el empleo, 40 Rev. Jur. U.I.P.R. 245, 261-262 (2006).

Con la Ley Núm. 115, supra, la Asamblea Legislativa reiteró la política pública a favor de los derechos de los trabajadores y amplió la protección legal de estos últimos cuando ofrecen información o testimonio en algún foro legislativo, administrativo o judicial. De esta manera, se reconoció el derecho del empleado en circunstancias en que la información no es privilegiada. Además, se ampliaron los remedios disponibles a un empleado protegido por la ley. Véanse, Exposición de Motivos de la Ley Núm. 115 de 20 de diciembre de 1991, supra; Rivera Prudencio v. Mun. de San Juan, supra; Irizarry v. J & J Cons. Prods. Co., Inc., supra.

En la jurisdicción federal, la ley principal sobre represalias es el Título VII de la Carta de Derechos de 1964, 42 U.S.C.S. sec. 2000e-3(a).[2] Esta ley federal

---

[2] "(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or

(continúa...)

tiene congruencias con nuestra Ley Núm. 115, supra. La protección de la ley federal es más limitada en tanto no incluye como actividad protegida el intento de ofrecer información o testimonio, pero es más amplia al proteger al trabajador sin requerir que se presente la información o testimonio en un foro administrativo, legislativo o judicial. Zeno Santiago, supra, pág. 262.

En la esfera federal, una querella bajo esta disposición requiere cumplir con lo siguiente: (1) incurrir en una actividad o conducta protegida por ley; (2) haber sufrido una acción disciplinaria o adversa por parte del patrono; y (3) que exista nexo causal entre la conducta protegida y la acción disciplinaria o adversa del patrono. Hazel v. United States Postmaster General, 7 F.3d 1 (1st Cir. 1993); Zeno Santiago, supra, pág. 249; L. Cooney, Understanding and Preventing Workplace Retaliation, 88 Mass. L. Rev. 3, 5 (2003). Existen otras leyes federales que protegen "a los empleados de despidos o discriminación en el empleo si éstos presentan una querella, inician una investigación o cooperan con la agencia para poner en ejecución las disposiciones en esa área de negocios o industria". Zeno Santiago, supra, pág. 254. Véase, 5 U.S.C. sec. 2302(b).

En Puerto Rico, además de la Ley Núm. 115, supra, y la Ley Núm. 80, supra, existen otras leyes locales que

*participated in any manner in an investigation, proceeding, or hearing*
(continúa...)

protegen a los trabajadores de represalias por parte de sus patronos. Véanse, Art. 20 de la Ley Núm. 69 de 6 de julio de 1985, 29 L.P.R.A. sec. 1340; y Sec. 1 de la Ley Núm. 17 de 22 de abril de 1988, 29 L.P.R.A. sec. 155b.

En Dorante v. Wrangler of Puerto Rico, supra, reconocimos que la disposición de represalias en la Ley Núm. 96 de 26 de junio de 1956, mejor conocida como Ley de Salario Mínimo, era extensiva a otras leyes laborales, sin limitarse a reclamaciones sobre salarios. En Irizarry v. J & J Cons. Prods. Co., Inc., supra, resolvimos que acudir al Fondo del Seguro del Estado es una actividad protegida por la Ley Núm. 115, supra, aunque esto no pueda considerarse un testimonio en el curso de una investigación administrativa. Lo resuelto en este caso "amplifica sustancialmente la protección al trabajador". D.M. Helfeld, Derecho Laboral, 70 Rev. Jur. U.P.R. 447, 456-459 (2001).

Más aun, en Cintrón v. Ritz Carlton, supra, le reconocimos protección bajo la disposición de represalias de la Ley Núm. 69 de 6 de julio de 1985, 29 L.P.R.A. sec. 1340, a dos empleados que acudieron al departamento de recursos humanos del patrono para querellarse de discrimen por razón de sexo. Para llegar a esta conclusión, aplicamos el principio de interpretación liberal.

---

*under this subchapter*". 42 U.S.C. sec. 2000e-3(a)

Conscientes de que la Ley Núm. 69, supra, se deriva del Título VII de la Ley de Derechos Civiles de 1964, acudimos a la jurisprudencia federal para interpretar nuestra disposición local. Los tribunales federales se encontraban divididos en cuanto a si una queja o investigación interna constituía actividad protegida bajo el Título VII, supra.[3] En aquella ocasión, este Tribunal decidió que una queja en un departamento o división interna de la empresa es actividad protegida al amparo del Art. 20 de la Ley Núm. 69, supra.

B

Según la Ley Núm. 115, supra, actividad protegida significa que el empleado "ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley". En lo que a este recurso respecta es preciso destacar que la protección cubre el acto de brindar cualquier información o expresión, ya sea de forma verbal o escrita, hecha para colaborar con un foro legislativo, administrativo o judicial. Claro está, esta

---

[3] Cooney, supra, págs. 7-8. Véase, EEOC v. Total System Services, Inc., 221 F.3d 1171 (11th Cir. 2000); Robbins v. Jefferson County School Dist. R-1, 186 F.3d 1253 (10th Cir. 1999); Vasconcelos v. Meese, 907 F.2d 111 (9th Cir. 1990); Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304 (6th Cir. 1989); Sias v. City Demonstration Agency, 588 F.2d 692 (9th Cir. 1978).

disposición solamente protege estas actividades en cuanto no sean difamatorias ni revelen información privilegiada según la ley.

Nos parece claro que esta disposición no protege a un trabajador por el mero hecho de haber sido objeto de represalias en relación a cómo se desempeña en las ejecutorias de su empleo. Es decir, la Ley Núm. 115, supra, no protege a los trabajadores contra acciones disciplinarias motivadas por la manera en que éstos ejecutan las funciones de sus puestos. Ahora bien, el caso ante nuestra consideración presenta un caso bajo la referida disposición legal debido a sus particularidades. Aunque las expresiones del querellante eran parte de las funciones de su empleo también eran parte de un proceso investigativo ante un ente judicial y otro administrativo.

No debe excluirse de la protección que brinda la Ley Núm. 115, id., a un trabajador que realiza una actividad protegida, tan sólo porque actuó dentro de los requerimientos de su puesto. De forma análoga, la EEOC ha establecido que la protección en contra de represalias del Título VII, supra, protege a un empleado cuando éste se opone a obedecer una orden como parte de su trabajo. Ello constituiría una práctica discriminatoria sancionada por la ley. De ese modo se protege a un empleado que se niega a realizar sus funciones de manera contraria a los propósitos perseguidos por la ley. Véase, Equal Employment

Opportunity Commission, EEOC Compliance Manual, 1998, http://www.eeoc.gov/policy/docs/retal.html

En otras palabras, las particularidades de este caso van más allá de simplemente realizar las funciones de un puesto. El peticionario brindaba información escrita mediante las bitácoras y los informes que eran examinados por una agencia federal (EPA) y por un monitor nombrado por el Tribunal Federal para el Distrito de Puerto Rico. Además, el peticionario realizaba expresiones verbales a funcionarios de la EPA y al monitor, cuando éstos visitaban las facilidades. Aunque estas actividades eran requeridas para el puesto que ocupaba el señor Rivera Figueroa, no podemos ignorar el hecho que eran expresiones ante un foro administrativo y otro judicial. Ante estos hechos, no podemos crear una excepción que el legislador no contempló, en detrimento de la clara política pública a favor del trabajador.

Coincidimos, pues, con la conclusión del foro primario en cuanto a que el señor Rivera Figueroa demostró que participó en una actividad protegida. De esta manera, se aseguran los derechos de los trabajadores contra represalias y se sostiene la efectividad del proceso investigativo que la Asamblea Legislativa protegió con la Ley Núm. 115, supra.

En resumen, la Ley Núm. 115, id., provee protección contra represalias por realizar una actividad protegida. La actividad protegida es brindar información ante los

foros señalados. En juicio, se probó la actividad protegida que realizaba el señor Rivera Figueroa y los actos de discrimen que sufrió. La AAA no puedo demostrar una razón legítima que justificara el discrimen hacia el peticionario. No surge del expediente que las expresiones realizadas por el peticionario hayan sido de carácter difamatorio o una divulgación de información privilegiada. El que las expresiones del señor Rivera Figueroa se hicieran en el transcurso de las funciones de su empleo no altera lo antes señalado. Por lo tanto, ante este panorama, la AAA tiene la responsabilidad de compensar los daños ocasionados conforme al inciso (b) del Art. 2 de la Ley Núm. 115, supra.

### IV

Por los fundamentos antes expuestos, se revoca la sentencia emitida por el Tribunal de Apelaciones y se reinstala la sentencia del Tribunal de Primera Instancia, Sala de Caguas.

Se dictará sentencia de conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|                                                                                                                   |                |
|-------------------------------------------------------------------------------------------------------------------|----------------|
| Santiago Rivera Figueroa, Olga María Carrasquillo Rodríguez y la Sociedad Legal de Gananciales compuesta por ambos<br>Peticionarios |  |
|                                                                                                                   | CC–<br>2007–285 |
| v.                                                                                                                |                |
| Autoridad de Acueductos y Alcantarillados de Puerto Rico y Aseguradora Equis<br>Recurridos                        |                |

*SENTENCIA*

En San Juan, Puerto Rico, a 23 de octubre de 2009.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca la sentencia emitida por el Tribunal de Apelaciones y se reinstala la sentencia del Tribunal de Primera Instancia, Sala de Caguas.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo interina.

Juliana Mosquera Soler
Secretaria del Tribunal Supremo Interina